IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION



Clerk, U.S District Court
District Of Montana
Missoula

| | |
|---|---|
| UNITED STATES OF AMERICA, | CV 13–05–M–DWM |
| Plaintiff, | |
| and | ORDER |
| MONTANA FAIR HOUSING, INC., | |
| Intervening Plaintiff | |
| vs. | |
| ANTHONY BOOTE, RED DOG CONSTRUCTION, LLC, CHARLES J. CHANDLER, CITY OF MISSOULA, and JOHN DOE, | |
| Defendants. | |

On January 11, 2013, the United States Department of Housing and Urban

Development ("HUD") filed a complaint alleging that Defendants Anthony Boote

("Boote"), Red Dog Construction, LLC ("Red Dog"), and Charles J. Chandler

("Chandler") violated the Federal Fair Housing Act Amendments ("Fair Housing

Act"), 42 U.S.C. § 3601 *et seq.* (Doc. 1.) HUD did not make any claims against

the City of Missoula ("Missoula"). On January 23, 2013, Intervening Plaintiff

Montana Fair Housing, Inc. ("Fair Housing") filed its Complaint in Intervention

1

against Boote, Red Dog, Chandler, and Missoula. (Doc. 7.) It alleged two counts against Boote, Red Dog, and Chandler (Counts I and II), which were resolved by entry of a Consent Order, (Docs. 3 and 3-1), and dismissed, (Doc. 8). The Complaint in Intervention alleges two counts against Missoula: Count III: violation of the Fair Housing Act and Count IV: violation of the Montana Human Rights Act ("Human Rights Act"), Mont. Code Ann. § 49-2-101, *et seq.*, and the Montana Governmental Code of Fair Practices ("Code of Fair Practices"), Mont. Code Ann. § 49-3-101, *et seq.*

Missoula is entitled to summary judgment as to part of Count III and part of Count IV. Summary disposition in favor of Missoula is appropriate as to Fair Housing's claims under 42 U.S.C. § 3604(f)(1) and (2), Montana Code Annotated § 49-2-305(1)(d) and (4)(c), and § 49-3-204. Genuine issues of material fact prevent summary disposition of Fair Housing's remaining claims. Missoula's motion to strike is denied. Fair Housing's motion to dismiss a count of the Complaint in Intervention is denied as moot. Finally, Fair Housing's request for judicial notice is denied and its motion to strike is granted.

## FACTUAL BACKGROUND

I.      **The Inez Property**

On June 7, 2011, Boote and Chandler submitted a Commercial Building

2

Permit Application to Missoula to build a four-plex residential building at 215 Inez Street in Missoula, Montana ("the Inez Property"). (Missoula's SUF, Doc. 26 at ¶ 2.) The building consisted of four dwelling units. Steve Meismer ("Meismer"), Senior Construction Plans Examiner for the Building Inspection Division of the Missoula Public Works Department, reviewed and approved the Inez Property plans. Meismer then stamped the plans with the following:

> . . . Compliance with the requirements of the State Building Code for physical accessibility to persons with disabilities does not necessarily guarantee compliance with the Americans With Disabilities Act of 1990, the Rehabilitation Act of 1973, the Fair Housing Amendments Act of 1988, Title 49, Chapter 2, commonly known as the Montana Human Rights Act or similar federal, state, or local laws that mandate accessibility to commercial construction of multifamily housing.

(*Id.* at ¶ 9.) Meismer reviewed the plans to determine if they complied with the city building code, i.e., the International Building Code (the "Building Code"). Meismer does not review designs for compliance with the Fair Housing Act or the Human Rights Act and does not consider those laws in reviewing building designs. (*Id.* at ¶¶ 4-5; Fair Housing's Br. in Opp., Doc. 41 at 2-3.)

Chandler commenced construction. (Missoula's SUF, Doc. 26 at ¶ 10.) Shortly thereafter, Chandler received a letter dated September 6, 2011 from Fair Housing, advising him that it was aware he was constructing a four-plex and of the need for construction to comply with the Fair Housing Act. Missoula inspected

the construction as it progressed. (*Id.*) Once construction was completed,

Missoula issued a Certificate of Occupancy for the Inez Property as a four-plex on

February 8, 2012. (*Id.* at ¶ 11.) The Certificate of Occupancy included the

following language:

> Compliance with the requirements of the State Building Code for physical accessibility to persons with disabilities does not necessarily guarantee compliance with the Americans With Disabilities Act of 1990, the Rehabilitation Act of 1973, the Fair Housing Amendments Act of 1988, Title 49, Chapter 2, commonly known as the Montana Human Rights Act or similar federal, state, or local laws that mandate accessibility to commercial construction of multifamily housing.

(*Id.*)

## II.    The Building Code

Sections 1101-1107 of the Building Code set out accessibility requirements

for a building with four or more dwellings. Pursuant to the Building Code,

> [w]here there are four or more dwelling units or sleeping units intended to be occupied as a residence in a single structure, every dwelling unit and sleeping unit intended to be occupied as a residence shall be a Type B unit. Exception: The number of Type B units is permitted to be reduced in accordance with section 1107.7.

§ 1107.6.2.1.2.

Section 1107.7.1 states: "Structures without elevator service. Where no

elevator service is provided in a structure, only the dwelling and sleeping units

that are located on stories indicated in Sections 1107.7.1.1 and 1107.7.1.2 are

4

required to be Type A and Type B units." The referenced sections read as follows:

1107.7.1.1 One story with Type B units required. At least one story containing dwelling units or sleeping units intended to be occupied as a residence shall be provided with an accessible entrance from the exterior of the structure and all units intended to be occupied as a residence on that story shall be Type B units.

1107.7.1.2 Additional stories with Type B units. On all other stories that have a building entrance in proximity to arrival points intended to serve units on that story, as indicated in Items 1 and 2, all dwelling units and sleeping units intended to be occupied as a residence served by that entrance on that story shall be Type B units.

1. Where the slopes of the undisturbed site measured between the planned entrance and all vehicular or pedestrian arrival points with 50 feet (15 240 mm) of the planned entrance are 10 percent or less,
   and
2. Where the slopes of the planned finished grade measured between the entrance and all vehicular or pedestrian arrival points within 50 feet (15 240 mm) of the planned entrance are 10 percent or less.

Where no such arrival points are within 50 feet (15 240 mm) of the entrance, the closest arrival point shall be used unless that arrival point serves the story required by Section 1107.7.1.1.

(Doc. 32-18 at 2.) Section 1107.7.2 then states

Multistory units. A multistory dwelling or sleeping unit which is not provided with elevator service is not required to be a Type B unit. Where a multistory unit is provided with external elevator service to only one floor, the floor provided with elevator service shall be the primary entry to the unit, shall comply with the requirements for a Type B unit and a toilet facility shall be provided on that floor.

5

(Doc. 38-10 at 3.)  Building officials have the authority to render interpretations of the Building Code and adopt policies and procedures in order to clarify its application as long as they do so in compliance with the intent and purpose of the Building Code.  (Building Code § 104.1, Doc. 32-16.)

The Inez Property is a four-plex, requiring it meet the general rule that all its units be Type B units unless any exceptions apply.  The Inez Property has a unique configuration, including three non-elevator units that start at ground level and are two stories in height and a fourth unit in the basement that is single-story and approximately 10' below ground level.  (Doc. 38-10 at 3-4.)  Meismer reviewed and approved the Inez Project for compliance with the Building Code.  Meismer determined that because the Inez Project included three two-story dwellings and one dwelling below grade, the units did not need to be Type B units per the exceptions discussed above.  (*Id.* at 4.)  Fair Housing contends this interpretation of the Building Code violates the Fair Housing Act, the Human Rights Act, and the Code of Fair Practices, and that Missoula made improper compliance statements to the parties involved in the project.

## STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

ANALYSIS

**I. Missoula is entitled to summary judgment as to Fair Housing's claims under 42 U.S.C. § 3604(f)(1) and (2), but a genuine issue of material fact remains as to Fair Housing's claims under 42 U.S.C. § 3617.**

Missoula insists that its failure to review and approve the plan and construction of the Inez Property for compliance with the Fair Housing Act is not a violation of that Act. Based on the plain language of the Act, Missoula is correct. The Fair Housing Act states that a municipality *may* review and approve new construction for compliance with the Act, but that the Secretary may not require that municipalities do so. 42 U.S.C. § 3604(f)(5)(B) and (C). Therefore, Missoula did not violate the Fair Housing Act by failing to review or approve the Inez Property for compliance with the Fair Housing Act. However, Fair Housing contends Missoula's interpretation of its own Building Code violates the Fair Housing Act by making housing "unavailable" to persons with disabilities and that

7

Missoula has interfered with individuals' housing rights through its statements and conduct in conjunction with the Inez Property.

Missoula first contends its interpretation of the Building Code is not relevant as the Complaint in Intervention does not allege a violation of the Building Code. However, Fair Housing's contentions regarding the Building Code are inextricably linked with its insistence that Missoula has violated the Fair Housing Act. (Doc. 7 at ¶ 27 ("It is the practice of [Missoula] to read, interpret and implement the [Building Code] in a manner that is inconsistent with accessibility requirements as set forth in the [Fair Housing Act] . . . .").) Second, Missoula contends a challenge to its interpretation of the Building Code is more properly reviewed by the Missoula Building Code Appeal Board, the Montana Department of Labor and Industry, and the Building Code Council. The Fair Housing Act does not require the filing of an administrative complaint before an aggrieved person commences a civil action in federal court. 42 U.S.C. § 3613(a)(2); *see also Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 103-104 (1979). Therefore, the failure to do so does not bar Fair Housing's ability to bring claims under the Fair Housing Act.

Finally, Missoula contends its interpretation of the Building Code does not fall under the Fair Housing Act because it is not a "land-use practice," but merely

a housing code. "Land-use practices," such as zoning decisions, are subject to the Fair Housing Act. *See Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1157 (9th Cir. 2013) (regarding a zoning ordinance that allegedly discriminated against group homes). Although the Ninth Circuit has provided distinct definitions for "housing codes" and "land use restrictions," *City of Edmonds v. Wash. St. Bldg. Code Council*, 18 F.3d 802, 804 n. 3 (9th Cir. 1994), the Fair Housing Act "prohibit[s] governmental entities from implementing or enforcing housing policies in a discriminatory manner against persons with disabilities," *Tsombanidis v. W. Haven Fire Dept.*, 352 F.3d 565, 573 (2nd Cir. 2003) (applying the Fair Housing Act to the interpretation of a fire code)[1]; *see also Pac. Shores Properties, LLC*, 730 F.3d at 1157 (citing the legislative history of the Fair Housing Act, including the desire that it "apply to state local land use or health and safety laws, regulations, practices, or decisions which discriminate against individuals with handicaps"). Thus, the interpretation and implementation of Missoula's housing policies may give rise to a violation of the Fair Housing Act.

   A.   **Fair Housing has failed to provide sufficient evidence of discriminatory intent or disparate impact to show that Missoula**

---

[1]   The Second Circuit notes that the Fire District did not specifically contest the application of the Fair Housing Act to the fire code. *Tsombanidis*, 352 F.3d at 574.

**made unavailable or denied a dwelling because of a handicap.**

The Fair Housing Act renders it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap . . . ." 42 U.S.C. § 3604(f)(1). Under this statute, a plaintiff can prove discrimination either by proving discriminatory intent (also called disparate treatment) or disparate impact on the statutorily protected class. *See Comm. Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 711 (9th Cir. 2009). Here, the Building Code provides that housing complexes with four or more dwellings must be built entirely with Type B units.[2] Fair Housing challenges Missoula's interpretation and application of the policy exceptions stating when Type B units are not necessary.

### 1. Intentional Discrimination

"A facially discriminatory policy is one which on its face applies less favorably to a protected group." *Community House, Inc. v. City of Boise*, 490 F.3d 1041, 1048 (9th Cir. 2006) (citation omitted). At the summary judgment stage, "a plaintiff makes out a prima facie case of intentional discrimination under the [Fair

---

[2]     A Type B unit is defined as "[a] dwelling or sleeping unit designed and constructed for accessibility in accordance with this code and the provisions for Type B units in ICC A117.1, consistent with the design and construction requirements of the federal Fair Housing Act." (Building Code, § 1102.1, Doc. 32-9.) Accessibility under the Building Code is then referred to in the context of "accessibility to physically disabled persons." (*Id.* at § 1101.1.)

10

Housing Act] merely by showing that a protected group has been subjected to explicitly differential—i.e. discriminatory—treatment." *Id.* at 1050 (citation omitted). To recover under the theory of disparate treatment, "[p]roof of discriminatory motive is crucial." *Gamble v. City of Escondido*, 104 F.3d 300, 305 (9th Cir. 1997). If a plaintiff makes out a prima facie case of intentional discrimination—showing that the policy or practice singles out a protected group—the analysis then turns to the defendant's justification for the policy, *Community House, Inc.*, 480 F.3d at 1051, and if the policy was not implemented "because of" the protected trait, the plaintiff's claim must fail. To create a triable issue of fact as to intentional discrimination, a plaintiff may "produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way." *Pac. Shores Properties, LLC*, 730 F.2d at 1158 (citation and internal quotation marks omitted). Alternatively, a plaintiff may show the existence of a similarly situated entity who or which was treated better. *Id.*

Even assuming Fair Housing has made an adequate showing that Missoula's interpretation of the Building Code singles out physically disabled persons, Fair Housing has failed to present any evidence of discriminatory motive. Fair

Housing has not produced any evidence that these individuals have been treated worse than others or produced direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated Missoula to interpret the Building Code in an allegedly discriminatory manner. For these reasons, Fair Housing's intentional discrimination argument fails.

## 2.    Disparate Impact

Disparate impact analysis focuses on facially neutral policies or practices that have a discriminatory effect. *Tsombanidis*, 352 F.3d at 574. To establish a prima facie case under this theory, the plaintiff must show: (1) the occurrence of certain outwardly neutral practices, and (2) a significant adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices. *City of Modesto*, 583 F.3d at 711; *see also* 24 C.F.R. § 100.500. Although a plaintiff does not need to show the defendant's action was based on discriminatory intent, the plaintiff has not met its burden if it merely raises an inference of discriminatory impact. *Tsombanidis*, 352 F.3d at 575. The plaintiff must prove the practice actually or predictably results in discrimination, 24 C.F.R. § 100.500(c)(1), and that there is a causal connection between the facially neutral policy and the alleged discriminatory effect, *Tsombanidis*, 352 F.3d at 575. If a plaintiff makes a prima facie showing, the

burden shifts to the defendant to "prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Id.*

Fair Housing has failed to make a prima facie showing of disparate impact. "Statistical evidence is . . . normally used in cases involving fair housing disparate impact claims[,]" and in the absence of such evidence, a court may look to qualitative evidence. *Tsombanidis*, 352 F.3d at 575-76 ("To prevail on a theory of disparate impact . . . there must be some evidence that a significant number of people suffering the handicap need [the housing] and that the [code] restricts a substantial portion of similarly handicapped individuals from [receiving it]."); *Darensburg v. Metro. Transp. Comn.*, 636 F.3d 511, 515 (9th Cir. 2011) (holding plaintiffs failed to establish a prima facie case for disparate impact regarding a railway expansion project because they did not provide an appropriate statistical measure). Here, Fair Housing presents no statistical information or qualitative evidence showing that § 1107.7.1 or its interpretation actually or predictably created a shortage of housing for physically disabled individuals in the community. Fair Housing merely contends that this practice "will predictably (*read* inevitably) have the same adverse effect at future properties." (Fair Housing's Br. in Opp., Doc. 41 at 21.) Fair Housing provides no information

regarding what types and quantities of housing are currently available to those suffering from disabilities or how many have been denied or would be denied housing based on Missoula's interpretation of the Building Code. Further, Missoula presents evidence that the Inez Property is a unique design and is therefore not reflective of most four-plex projects in Missoula. (Missoula's Reply, Doc. 45 at 8; Doc. 43 at 5, ¶ 12.) Fair Housing fails to explain how Missoula's application of the Building Code to the Inez Property reflects its application of the Building Code in any other instance.

Accordingly, summary judgment is granted in favor of Missoula and denied as to Fair Housing regarding Fair Housing's claims under 42 U.S.C. § 3604(f)(1).

### B. Missoula did not discriminate in the provision of services in violation of 42 U.S.C. § 3604(f)(2).

Fair Housing contends Missoula performs plan review services in conflict with the directive of the Building Code in a manner that violates 42 U.S.C. § 3604(f)(2). Fair Housing's argument as to this issue is unpersuasive as the "service" alleged is the review and approval of design and construction. As discussed earlier, Missoula does not have a duty under the Fair Housing Act to review and approve designs and construction for compliance with the Act. To the extent Fair Housing premises its argument on Missoula's interpretation of the

Building Code, its argument suffers from the same inadequacies as discussed above. Therefore, summary judgment is granted in favor of Missoula and denied as to Fair Housing regarding Fair Housing's claims under § 3604(f)(2).

**C.  A genuine issue of material fact remains as to whether Missoula interfered with a person's exercise or enjoyment of a right under 42 U.S.C. § 3617.**

Fair Housing contends triable issues of fact remain as to whether Missoula interfered with the exercise of rights under federal fair housing laws. The Fair Housing Act provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person . . . on account of his having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected" under the Act. 42 U.S.C. § 3617. The language "interfere with" has been broadly applied "to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws." *United States v. City of Hayward*, 36 F.3d 832, 835 (9th Cir. 1994) (quotation marks and citation omitted).

Fair Housing alleges Missoula interfered by (1) failing to require a written acknowledgment for the Inez Property, (2) making improper compliance statements to Boote, Chandler, and Red Dog, (3) failing to provide its employees with working knowledge of fair housing requirements, (4) failing to regularly review its building department operations, and (5) failing to take any action to

remedy the alleged violations of the Fair Housing Act at the Inez Property. A genuine issue of material fact remains as to what actions Missoula took regarding an acknowledgment and what it told the designers and builders of the Inez Property regarding their compliance with the Fair Housing Act. Fair Housing's additional contentions are merely conclusory statements and, as such, do not provide additional grounds for finding a genuine issue of material fact.

Missoula admits that it has no record of receiving an acknowledgment for the Inez Property.[3] If Missoula was required to take certain steps and it did not do so, this may rise to the level of interference under the Fair Housing Act. Fair Housing further argues that Missoula interfered when it informed the parties involved in the Inez Property that their design and construction complied with Fair Housing Act standards. Missoula contends no such statements were made and a disclaimer was stamped on both the plans and the Certificate of Occupancy stating that it had not reviewed the plans for compliance with the Fair Housing Act. (Missoula's SUF, Doc. 26 at ¶¶ 4-7.) Although Fair Housing does not dispute the presence and content of the disclaimers, it has presented evidence that Chandler

---

[3]    In 2003, a settlement was reached between Missoula and Fair Housing in which Missoula agreed to take affirmative actions to assure that "all persons applying for a building permit acknowledged in writing their obligations under the [Fair Housing Act .]" (Fair Housing's Br. in Opp., Doc. 41 at 20.)

represented to HUD that Meismer told him the Inez Property complied with the Fair Housing Act. (Fair Housing's St. Disp. Facts, Doc. 38 at 4-6.) This is sufficient to raise a genuine dispute as to whether Missoula "interfered" in violation of § 3617. Therefore, Missoula's motion for summary judgment is denied as to Fair Housing's claims under 42 U.S.C. § 3617.

## II. Missoula is entitled to summary judgment as to Fair Housing's claim under § 49-2-305(1)(d) and (4)(c), but genuine issues of material fact remain as to Fair Housing's claims under § 49-2-305(3) and (9).

### A. Missoula is a "person" for the purposes of § 49-2-305.

Montana Code Annotated § 49-2-305 prohibits an "owner, lessor, manager . . . or any other person" from engaging in unlawful discriminatory practices. The term "person" is defined as "one or more individuals, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated employees' associations, employers, employment agencies, organizations or labor organizations." Mont. Code Ann. § 49-2-101(18).

Here, Missoula is a "person" for the purposes of § 49-2-305. Missoula's insistence that a municipal corporation is distinct from a business corporation is unpersuasive under the plain language of the statute, which includes "corporation" in its definition of "person." *See Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68

(1982) (stating that legislative purpose is generally expressed by the ordinary

meaning of the words used); *United States v. Hunter*, 101 F.3d 82, 84 (9th Cir.

1996) (stating that absent a clearly expressed legislative intent to the contrary, the

plain language of the statute is ordinarily conclusive); *Fandrich v. Capital Ford

Lincoln Mercury*, 901 P.2d 112, 115 (Mont. 1995) (looking first to "the plain

language of the statute" in construing § 49-2-101)).

Missoula's further contention that the Code of Fair Practices and the Human

Rights Act are mutually exclusive in situations involving municipalities is equally

unpersuasive. *See Mont. Fair Housing v. City of Bozeman*, 854 F. Supp. 2d 832,

843-845 (D. Mont. 2012) (applying § 49-2-305 to the City of Bozeman); *Ross v.

City of Great Falls*, 967 P.2d 1103, 1105 (Mont. 1998) (explaining that

"employer" under § 49-2-101(11) applies to both public and private entities).

Additionally, the Montana Legislature "has indicated its clear intent that the

[Human Rights Act] be interpreted consistently with federal discrimination statues

and case law." *BNSF Ry. Co. v. Feit*, 281 P.3d 225, 228 (Mont. 2012)

(specifically referencing the Americans with Disabilities Act).

### B. Missoula is entitled to summary judgment as to Fair Housing's claims under § 49-2-305(1)(d) and 4(c).

Under Montana Code Annotated § 49-2-305(1)(d), "[i]t is an unlawful

discriminatory practice for the owner, lessor, or manager having the right to sell, lease or rent a housing accommodation . . . or for any other person . . . to otherwise make unavailable or deny a housing accommodation or property because of . . . physical or mental disability . . . ." Both Missoula and Fair Housing ask the Court to cross-apply their arguments as to 42 U.S.C. § 3604(f)(1) of the Fair Housing Act as the two are substantially equivalent. As Fair Housing's argument under § 3604(f)(1) lacked merit, so does Fair Housing's argument pursuant to § 49-2-305(1)(d). The same analysis applies for 42 U.S.C. § 3604(f)(2) and § 49-2-305(4)(c) regarding discrimination in the provision of services. Therefore, Missoula is entitled to summary judgment as to these claims.

**C.    A genuine issue of material fact prevents summary disposition of Fair Housing's claims under § 49-2-305(3) and (9).**

Under § 49-2-305(3), "[i]t is an unlawful discriminatory practice to make, print or publish or cause to be made, printed, or published any notice, statement, or advertisement that indicates any preference, limitation, or discrimination that is prohibited by [§ 49-2-305(1)] or any intention to make or have a prohibited preference, limitation, or discrimination." Under § 49-2-305(9), "[i]t is an unlawful discriminatory practice to coerce, intimidate, threaten, or interfere with a person in the exercise or enjoyment of or because of the person having exercised

or enjoyed or having aided or encouraged any other person in the exercise or enjoyment of a right granted or protected by this section." As discussed above, a genuine issue of material fact remains as to what statements and/or representations Missoula made to the parties involved in the Inez Property regarding compliance with fair housing laws, preventing summary disposition of Fair Housing's claims.

## III. Missoula is entitled to summary judgment as to Fair Housing's claims under the Code of Fair Practices, § 49-3-204.

Finally, Fair Housing contends Missoula breached the affirmative duties imposed upon it by the Code of Fair Practices when it failed to take appropriate action in the exercise of its licensing and regulatory power in violation of Montana Code Annotated § 49-3-204. Missoula contends the Court does not have jurisdiction to adjudicate this claim as the proper administrative procedures were not followed. Fair Housing initially filed a motion to voluntarily dismiss this claim (Doc. 36), which has since been voluntarily withdrawn (Doc. 52).

Montana Code Annotated § 49-3-315 provides that the procedures for enforcing the Code of Fair Practices are the same as the procedures for enforcing the Human Rights Act. The procedures for enforcing the Human Rights Act are outlined in Montana Code Annotated § 49-2-501, *et seq.* Section 49-2-512(1) provides in pertinent part:

> The provisions of this chapter establish the exclusive remedy for acts
> constituting an alleged violation of chapter 3 or this chapter, . . . . A
> claim or request for relief based upon the acts may not be entertained by
> a district court other than by the procedures specified in this chapter.

A person who has filed a charge of discrimination under the Code of Fair Practices may not file a complaint in district court until it has filed a charge of discrimination with the Human Rights Bureau and the Human Rights Bureau has issued a notice of dismissal. Mont. Code Ann. § 49-2-512(3).

As it is uncontested that this matter must first be heard by and a decision reached by the Human Rights Bureau before it may be heard by this Court, summary judgment is appropriate on these grounds. (*See* Doc. 53.) Therefore, Missoula's motion for summary judgment as to Fair Housing's claim under § 49-3-204 is granted and Missoula's motion to strike is denied.

## IV.    Fair Housing's request for judicial notice is denied.

Fair Housing requests that the Court take judicial notice of certain webpages produced by the International Code Council. (Doc. 48.) Fair Housing has failed to provide any grounds for why the Court should take judicial notice of these particular web pages. Furthermore, these facts are legislative facts, as opposed to adjudicative facts, and are thus not properly subject to judicial notice under Rule 201 of the Federal Rules of Evidence. Fed. R. Evid. 201(a). Therefore, Fair

Housing's request is denied.

## V.     Fair Housing's motion to strike is granted.

Fair Housing moves to strike statements made by its counsel during the

HUD conciliation process from all documents filed by Missoula, including:

(1)     Missoula's Statement of Disputed Facts (Doc. 43 at ¶ 9);
(2)     Exhibit D to the Statement of Disputed Facts (Doc. 43-4); and
(3)     Brief in Opposition to Fair Housing's motion for summary
        judgment (Doc. 44 at 8 and 21).

(Doc. 46.)

The Fair Housing Act prohibits the use of statements made in conciliation

from disclosure and subsequent use without the written consent of the parties in

the communication. 42 U.S.C. § 3610(d)(1). There is no indication under the

statute that this consent requirement is waivable. At a minimum, filing these

statements with the Court has made them public without the consent of Fair

Housing in violation of the statute. Therefore, Fair Housing's motion to strike the

abovementioned statements from the record is granted. This determination does

not affect the outcome of the other issues discussed in this order.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that Missoula's motion for

summary judgment (Doc. 24) is GRANTED IN PART and DENIED IN PART. It

is GRANTED as to Fair Housing claims under 42 U.S.C. § 3604(f)(1) and (2) (part of Count III), § 49-2-305(1)(d) and (4)(c) (part of Count IV), and § 49-3-204 (part of Count IV) and DENIED in all other respects.

IT IS FURTHER ORDERED that Fair Housing's motion for partial summary judgment (Doc. 31) is DENIED.

IT IS FURTHER ORDERED that Fair Housing's motion to voluntarily dismiss its claim (Doc. 36) is DENIED as MOOT.

IT IS FURTHER ORDERED that Missoula's motion to strike (Doc. 57) is DENIED.

IT IS FURTHER ORDERED that Fair Housing's request for judicial notice (Doc. 48) is DENIED.

IT IS FURTHER ORDERED that Fair Housing's motion to strike (Doc. 46) is GRANTED. The HUD conciliation statements filed at ¶ 9 of the Statement of Undisputed Facts (Doc. 43), Exhibit D to the Statement of Undisputed Facts (Doc. 43-4), and the references made in Missoula's brief in opposition at pages 8 and 21 (Doc. 44) are stricken from the record.

Dated this 3rd day of April, 2014.

Donald W. Molloy, District Judge
United States District Court

23